## WEBSTER v. UPTON, ASSIGNEE.

1. The doctrine announced in *Upton* v. *Tribilcock, supra,* that the original holders of the stock of a corporation are liable for the unpaid balances at the suit of its assignee in bankruptcy, without any express promise to pay, reaffirmed.
2. The transferee of stock is liable for calls made after he has been accepted by the company as a stockholder, and his name registered on the stock books as a corporator; and, being thus liable, there is an implied promise that he will pay calls made upon such stock while he continues its owner.
3. A purchase of stock is of itself authority to the vendor to make a legal transfer thereof to the vendee on the books of the company.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

The facts are stated in the opinion of the court.

Submitted on printed arguments by *Mr. E. Van Buren* for the plaintiff in error, and *Mr. L. H. Boutell* for the defendant in error.

MR. JUSTICE STRONG delivered the opinion of the court.

The Great Western Insurance Company, of which the plaintiff below is the assignee in bankruptcy, was incorporated under the laws of Illinois in 1857, with general power to insure all kinds of property against both fire and marine losses. Subsequently to its organization, its capital was increased to more than $1,000,000, and it was authorized by law further to increase its capital to $5,000,000. It does not appear, however, from the record, that, of the stock subscribed, more than about $222,000 was ever paid in, — a sum equal to nearly twenty per cent of the par value, — leaving over $965,000 of subscribed capital unpaid. In this condition the company went into bankruptcy in 1872, owing a very large sum, equal to if not greater than its entire subscribed capital; and Clark W. Upton, the plaintiff, became the assignee. The District Court then directed a call to be made for the eighty per cent remaining unpaid of the capital stock. A call was accordingly made; and, payments having been neglected, the assignee brought this suit against the defendant, averring that he was the holder of one hundred shares, of the par value of one hundred dollars each, and, as such, responsible for the

eighty per cent unpaid. On the trial, evidence was given tending to show that one Hale was the owner of a large amount of the stock of the company, for which he held the company's certificates; and that he had, through his brother, sold one hundred shares to the defendant, on which twenty per cent had been paid. The books of the company had been destroyed in the great fire in Chicago in 1871; but there was evidence tending to show that the defendant's name was on the stock ledger, and that the defendant transferred, or caused the stock bought from Hale to be transferred to himself on the books of the company. The district judge submitted to the jury to find whether the defendant actually thus became a stockholder, recognized as such on the books of the company; instructing them, that, if he did, he was liable for the eighty per cent unpaid as if he had been an original subscriber. A verdict and judgment having been recovered by the plaintiff, the case was removed by writ of error to the Circuit Court, where the judgment was affirmed; and the judgment of affirmance we are now called upon to review.

The leading assignment of error here is that the court below erroneously ruled that an assignee of stock, or of a certificate of stock, in an insurance company, is liable for future calls or assessments without an agreement or promise to pay. This, however, is not a fair statement of what the court did rule. The court instructed the jury, in effect, that the transferee of stock on the books of an insurance company, on which only twenty per cent of its nominal value has been paid, is liable for calls for the unpaid portion made during his ownership, without proof of any *express* promise by him to pay such calls. This instruction, we think, was entirely correct. The capital stock of an insurance company, like that of any other business corporation, is a trust fund for the protection of its creditors or those who deal with it. Neither the stockholders, nor their agents the directors, can rightfully withhold any portion of the stock from the reach of those who have lawful claims against the company. And the stock thus held in trust is the whole stock, not merely that percentage of it which has been called in and paid. This has been decided so often, that it has become a familiar doctrine. But what is it worth if there is

no legal liability resting on the stockholders to pay the unpaid portion of their shares, unless they have expressly promised to pay it? Stockholders become such in several ways, — either by original subscription, or by assignment of prior holders, or by direct purchase from the company. An express promise is almost unknown, except in the case of an original subscription; and oftener than otherwise it is not made in that. The subscriber merely agrees to take stock. He does not expressly promise to pay for it. Practically, then, unless the ownership of such stock carries with it the legal duty of paying all legitimate calls made during the continuance of the ownership, the fund held in trust for creditors is only that portion of each share which was paid prior to the organization of the company, — in many cases, not more than five per cent; in the present, only twenty. Then the company commences business and incurs obligations, representing all the while to those who deal with it that its capital is the amount of stock taken, when in truth the fund which is held in trust for creditors is only that part of the stock which has been actually paid in. This cannot be. If it is, very many corporations make fraudulent representations daily to those who give them credit. The Great Western Insurance Company reported to the auditor of public accounts, as required by law, that the amount of its capital stock outstanding (par value of shares $100 each) was $1,188,000, that the amount of paid-up capital stock was $222,831.42, and that the amount of subscribed capital for which the subscribers or holders were liable was $965,168.58. This report was made on the 10th of January, 1871. Thus those who effected insurances with the company were assured that over one million of dollars were held as a trust fund to secure the company's payment of their policies. But, if the subscribers and holders of the shares are not liable for the more than eighty per cent unpaid, the representation was untrue. Persons assured have less than one-fifth the security that was promised them. This is not what the statutes authorizing the incorporation of the company contemplated. The stock was required to be not less than a given amount, though the company was authorized to commence business when five per cent of that amount was paid in. Why fix a minimum amount of stock if all of it was not

intended to be a security for those who obtained insurance? There is no conceivable reason for such a requirement, unless it be either to provide for the creditors a capital sufficient for their security, or to secure the stockholders themselves against the consequences of an inadequate capital. The plain object of the statute, therefore, would be defeated if there is no liability of the stockholder to pay the full prescribed amount of each share of his stock. With this plain object of the legislature in view, it must be assumed, after the verdict of the jury, the defendant voluntarily became a stockholder. Either he must have designed to defeat the legislative intent, or he must have consented to carry it out. The former is not to be presumed; and if the latter was the fact, coming as he did into privity with the company, there is a necessary implication that he undertook to complete the payment of all that was unpaid of the shares he held whenever it should be demanded. To constitute a promise binding in law, no form of words is necessary. An implied promise is proved by circumstantial evidence; by proof of circumstances that show the party intended to assume an obligation. A party may assume an obligation by putting himself into a position which requires the performance of duties.

What we have said thus far is applicable to the case of an original subscriber to the stock, and equally to a transferee of the stock who has become such by transfer on the books of the company. There are, it is true, decisions of highly respectable courts to be found, in which it was held that even a subscriber to the capital stock of an incorporated company is not personally liable for calls, unless he has expressly promised to pay them, or unless the act of incorporation or some statute declares that he shall pay them. Such was the decision of a Supreme Court of New York, in *The Fort Edward and Fort Miller Plank Road Company* v. *Payne*, 17 Barb. 567. A similar ruling was made in *The Kennebec and Portland Railroad Company* v. *Kendall*, 31 Me. 470. A like ruling has also been made in Massachusetts. In most if not all of these cases, it appeared that the law authorizing the incorporation of the companies had provided a remedy for non-payment of calls or assessments of the unpaid portions of the stock taken. The company was authorized to

declare forfeited or to sell the stock for default of the stockholder; and, the law having given such a remedy, it was held to be exclusive of any other. Yet in them all it was conceded, that, if the statute had declared the calls or assessments should be paid, an action of assumpsit might be maintained against the original stockholder on a promise to pay, implied only from the legislative intent. Surely the legislative intent that the full value of the stock authorized and required to be subscribed, in other words, the entire capital, shall be, in fact, paid in when required, — that it shall be real, and not merely nominal, — is plain enough when the authority to exist as a corporation and to do business is given on condition that the capital subscribed shall not be less than a specified sum. A requisition that the subscribed stock shall not be less than one million of dollars would be idle if the subscribers need pay only a first instalment on their subscriptions; for example, five per cent. Manifestly that would not be what the law intended; and, if its intent was that the whole capital might be called in, it is difficult to see why a subscriber, knowing that intent, and voluntarily becoming a subscriber, does not impliedly engage to pay in full for his shares when payment is required. It is, however, unnecessary to discuss this question further; for it is settled by the judgment of this court. In *Upton, Assignee,* v. *Tribilcock, supra,* 45, we ruled that the original holders of the stock are liable for the unpaid balances at the suit of the assignee in bankruptcy, and that without any express promise to pay. The bankrupt corporation in that case was the same as in this.

But, if the law implies a promise by the original holders or subscribers to pay the full par value when it may be called, it follows that an assignee of the stock, when he has come into privity with the company by having stock transferred to him on the company's books, is equally liable. The same reasons exist for implying a promise by him as exist for raising up a promise by his assignor. And such is the law as laid down by the text-writers generally, and by many decisions of the courts. *Bond* v. *The Susquehanna Bridge,* 6 Har. & J. 128; *Hall* v. *United States Insurance Company,* 5 Gill, 484; *Railroad Company* v. *Boorman,* 12 Conn. 530; *Haddersfield Canal Company* v. *Buckley,* 7 T. M. 36. There are a very few cases, it

must be admitted, in which it has been held that the purchaser of stock, partially paid, is not liable for calls made after his purchase. Those to which we have been referred are *Canal Company* v. *Sansom*, 1 Binn. 70, where the question seems hardly to have been considered, the claim upon the transferee having been abandoned; and *Palmer* v. *The Ridge Mining Company*, 34 Penn. St. 288, which is rested upon *Sansom's Case*, and upon the fact, that, by the charter, the company was authorized to forfeit the stock for non-payment of calls. We are also referred to *Seymour* v. *Sturgess*, 26 N. Y. 134, the circumstances of which were very peculiar. In neither of these cases was it brought to the attention of the court that the stock was a trust fund held for the protection of creditors in the first instance, a fund no part of which either the company or its stockholders was at liberty to withhold. They do not, we think, assert the doctrine which is generally accepted. In Angell and Ames on Corporations, sect. 534, it is said, —

" When an original subscriber to the stock of an incorporated company, who is so bound to pay the instalments on his subscription from time to time as they are called in by the company, transfers his stock to another person, such other person is substituted not only to the rights, but to the obligations, of the original subscriber, and he is bound to pay up the instalments called for after the transfer to him. The liability to pay the instalments is shifted from the outgoing to the incoming shareholder. A privity is created between the two by the assignment of the one and the acceptance of the other, and also between them and the corporation; for it would be absurd to say, upon general reasoning, that, if the original subscribers have the power of assigning their shares, they should, after disposing of them, be liable to the burdens which are thrown upon the owners of the stock."

So in Redfield on Railways, 53, it is said the cases agree that whenever the name of the vendee of shares is transferred to the register of shareholders, the vendor is exonerated, and the vendee becomes liable for calls. We think, therefore, the transferee of stock in an incorporated company is liable for calls made after he has been accepted by the company as a stockholder, and his name has been registered on the stock books as a corporator; and, being thus liable, there is an implid promise that he will pay calls made while he continues the owner.

All the cases agree that creditors of a corporation may compel payment of the stock subscribed, so far as it is necessary for the satisfaction of the debts due by the company. This results from the fact that the whole subscribed capital is a trust fund for the payment of creditors when the company becomes insolvent. From this it is a legitimate deduction that the stock cannot be released; that is, that the liabilities of the stockholders cannot be discharged by the company to the injury of creditors without payment. The fact, therefore, that in this case the certificate of stock taken by the defendant below was marked " non-assessable," is of no importance. The suit is brought by the assignee in bankruptcy, who represents creditors; and, as against him, the company had no right to release the holders of the stock from the payment of the eighty per cent unpaid.

The second assignment of error and the third are, in substance, that the court should not have admitted in evidence the order of the District Court, directing a call by the assignee of the unpaid balance of the stock, and should not have ruled that the call made under the order was effective to make the liability of the defendant complete. That these assignments cannot be sustained was decided in *Sanger* v. *Upton, supra,* p. 56, — a case before us at this term. Nothing more need be said in reference to them.

The last assignment of any thing that can be assigned for error is, that the court charged the jury as follows: " The only question is, was the defendant a stockholder of the company? If the testimony satisfies you that the defendant purchased of Hale one hundred shares of this stock, and that it was transferred in the books of the company, either by Webster, the defendant, or by Hale, who sold the stock, or by the direction of either of them, then the defendant is liable the same as if he had subscribed for the stock." The objection urged against this is that a transfer on the books directed by Hale, after the purchase by Webster, could not affect the latter's liability. But, if Webster became the purchaser, it was his vendor's duty to make the transfer to him, where only a legal transfer could be made, — namely, on the books of the company; and the purchase was in itself authority to the vendor to make the transfer.

Still further, it was Webster's duty to have the legal transfer made to relieve the vendor from liability to future calls. A court of equity will compel a transferee of stock to record the transfer, and to pay all calls after the transfer. 3 De G. & Sm. Ch. 310. If so, it is clear that the vendor may himself request the transfer to be made; and that, when it is made at his request, the buyer becomes responsible for subsequent calls. This, however, does not interfere with the right of one who appears to be a stockholder on the books of a company to show that his name appears on the books without right and without his authority.

*The judgment of the Circuit Court is affirmed.*